OPINION
{¶ 1} Defendant-appellant Reno S. Thomas appeals from his conviction and sentence for Aggravated Burglary, Domestic Violence, Abduction and Disrupting Public Services. He contends that the trial court erred by admitting expert testimony on the subject of domestic violence. Thomas also contends that the trial court's finding that he was in possession of an operable firearm, a specification to the offense of Aggravated Burglary of which he was convicted, is not supported by sufficient, credible evidence. He further contends that the record demonstrates that his convictions for Aggravated Burglary and Disruption of Public Services are against the manifest weight of the evidence. Finally, Thomas claims that his trial counsel was ineffective.
 {¶ 2} We conclude that the trial court did not abuse its discretion in admitting expert testimony or in concluding that any unfair prejudicial impact of this testimony outweighed its probative value. We further conclude that there is sufficient evidence in the record to support the trial court's finding that Thomas was in possession of an operable firearm. The convictions are supported by the evidence, and we find no merit to the claim of ineffective assistance of counsel. Accordingly, the judgment of the trial court is affirmed.
 I {¶ 3} The State presented evidence that Tiffany Peterson and Thomas were involved in a romantic relationship from the time Peterson was fifteen years old. In April, 2001, Peterson decided to end her relationship with Thomas. As a result of Peterson's attempt to sever her ties with Thomas, Thomas became violent. On April 28, 2001 and June 15, 2001, he went to Peterson's apartment and assaulted her. During the incident on June 15, Thomas pointed a gun at Tiffany and threatened to kill her if she broke up with him. On June 3, 2001, Thomas observed Tiffany at a gas station talking to another man. Thomas forced Peterson into his car, drove her to his sister's residence, and assaulted her.
 {¶ 4} Thomas was indicted by the Montgomery County Grand Jury on two counts of Aggravated Burglary, in violation of R.C. 2911.11(A)(1), three counts of Domestic Violence, in violation of R.C. 2919.25(A), one count of Abduction, in violation of R.C. 2905.02(A)(1), and one count of Disrupting Public Services, in violation of R.C. 2909.04(A)(1). One count of Aggravated Burglary, as charged in Count Five of the indictment, was accompanied by a firearm specification.
 {¶ 5} At trial, the State called Peterson as a hostile witness. During the course of her testimony, Peterson repeatedly indicated that she did not want to testify. She also characterized the three incidents as mere disagreements between her and Thomas, which caused her to "try to get him in trouble" by getting the police involved. She testified that she had exaggerated or made up the facts contained in each of her written police statements. However, she did admit to writing the statements, and she did admit that she and Thomas were involved in altercations on the dates in question.
 {¶ 6} The State called Margene Robinson as an expert witness on the topic of domestic violence. Robinson is retired from the Dayton Police Department, where she served as an officer for twenty-five years. She first became involved with the issue of domestic violence in the 1970's, before domestic violence was recognized as a distinct type of crime. Since 1983, she has been involved in training officers in domestic violence issues and writing department policies for handling domestic violence cases. She also has attended state, national and international programs on the subject.
 {¶ 7} During the last three years of her employment, Robinson was promoted to Lieutenant, in charge of the Dayton Police Department's Domestic Violence Unit, during which time the unit handled approximately ten thousand cases involving domestic violence. Robinson was personally involved with about one-half of those cases.
 {¶ 8} Robinson is a certified instructor with the Ohio Police Officers Training Academy in London, Ohio, and has a permanent teaching certificate for domestic violence training. She teaches police officers, judges and prosecutors throughout the State of Ohio. She had, at the time of Thomas's trial, just recently trained thirty police agencies in Montgomery County.
 {¶ 9} Robinson served on the Montgomery County Domestic Violence Task Force, as well as on a State committee writing grants for domestic violence programs. She was "the driving force" behind the writing of the City of Dayton Domestic Violence Protocol regarding the proper procedure for police officer responses to domestic violence. Robinson also served on the Board of Directors, as well as a volunteer, for the Artemis Center, which is a local agency that assists domestic violence victims.
 {¶ 10} During trial, Robinson testified that many people do not tend to believe women who claim to be battered, because they do not understand the phenomenon of domestic violence. She also testified to the vast number of domestic violence incidents: 3,500 in Dayton alone. She testified to the factors leading to abuse, and showed how abusers control their victims through intimidation, economic abuse, isolation, and the use of children as pawns.
 {¶ 11} Robinson also testified that in her experience, many victims recant. She also testified that many victims tend to minimize the abuse. She testified that in as many as eighty-five percent of the cases she handled, the victims recanted. She testified that this is due to a number of factors, including the relationship getting back on track, the fact that it is dangerous for women to testify regarding their abusers, and that many abusers tend to "behave" between the time of the abuse and the time of trial.
 {¶ 12} Robinson testified that a battered woman is seventy-five percent more likely to die trying to leave an abusive relationship than by staying. She testified that many victims blame themselves for the abuse and tend to hope that the situation will improve. She testified that many victims stay in the relationship because the abuser subjects them to fear, isolation, economic abuse, and threats of homicide or suicide.
 {¶ 13} Robinson also testified that she did not meet or interview Peterson, and that she had not read the police reports on this case. Finally, she testified that she had never testified in court as an expert before testifying in this case.
 {¶ 14} Thomas was convicted on all charges except for the Aggravated Burglary charge set forth in Count I of the indictment, which did not carry a firearm specification. He was sentenced accordingly. From his conviction and sentence, Thomas appeals.
 II {¶ 15} Thomas's First Assignment of Error states as follows:
 {¶ 16} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR PERMITTING `EXPERT WITNESS' TESTIMONY ON THE CREDIBILITY OF COMPLAINANT'S TESTIMONY."
 {¶ 17} Thomas contends that the trial court should not have permitted the State to present Margene Robinson as an expert on the subject of domestic violence. He claims that if she had not testified, he would not have been convicted of Aggravated Burglary. In support, he argues that Robinson's testimony did not meet the requirements of Evid.R. 702, and was more prejudicial than probative. Though not specifically argued, the wording of the Assignment of Error indicates that Thomas also believes that Robinson's testimony improperly commented upon the credibility of Peterson as the complainant.
 {¶ 18} "In determining the admissibility of an expert witness's testimony, a court must consider whether that witness will aid the trier of fact in search of the truth." State v. Dyson (Oct. 27, 2000), Champaign App. No. 2000CA2, citation omitted. "Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury." Id., citation omitted. We are mindful that when reviewing rulings concerning the admissibility of expert testimony, the admissibility of the evidence is a matter committed to the sound discretion of the trial court. State v. Samuels, 2003 WL 21291047, 2003-Ohio-2865, ¶ 23. Thus, the judgment of the trial court will not be disturbed absent an abuse of discretion. Id.
 {¶ 19} Evid.R. 702, which governs the admissibility of expert testimony, states that:
 {¶ 20} "A witness may testify as an expert if all of the following apply:
 {¶ 21} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 22} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 23} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information ***."
 {¶ 24} Thomas first raises the argument that he would not have been convicted of Aggravated Burglary, with a gun specification, if Robinson had not testified. He bases this upon his claim that he was willing to concede his guilt on the domestic violence charge, thereby rendering Robinson's testimony unnecessary, and that Peterson's testimony alone would have been insufficient to support the Aggravated Burglary conviction.
 {¶ 25} We disagree. As noted later in this opinion, we conclude that even without Robinson's testimony, the State presented sufficient evidence to support the conviction. Furthermore, the State was not required to accept Thomas's concession that he was guilty of domestic violence charges; to the contrary, the State had both the right and the duty to present evidence on every element of each charge, upon which it bore the burden of proof. Robinson did not comment on the Aggravated Burglary charge, and did not even intimate that offenses like Aggravated Burglary are a natural consequence of, or evolution from, domestic violence.
 {¶ 26} Thomas next contends that Robinson's testimony does not meet the requirement that her testimony relate to matters beyond the knowledge or experience of lay persons, because most adults are familiar with domestic violence. We have addressed this issue, and stated that although the average person may be aware of the existence of domestic violence, it does not follow that the average person would "have a detailed understanding of the inner-workings of an abusive relationship, notwithstanding some awareness of domestic violence in our society."Dyson, supra.
 {¶ 27} Thomas next contends that Robinson was not qualified as an expert, because her experience is "questionable," and because she had never testified as an expert in any previous cases, had never met Peterson, and was not familiar with the circumstances of this case. We find nothing "questionable" about Robinson's qualifications; we conclude that the trial court did not err in designating her as expert. The record indicates that she has vast experience from both working and training in the field. The fact that Robinson had not previously testified as an expert does not disqualify her as an expert witness. All expert witnesses presumably have a first time testifying as an expert. If a witness cannot qualify as an expert without prior experience testifying as an expert, there can never be expert witnesses. "[A]s with any expert witness, that witness must at some point in time be qualified for the first time as an expert in a certain field. The fact that the witness may have limited opportunities to testify before a court of law does not limit his knowledge of the subject in any manner." State v. Moulder, Cuyahoga App. No. 80266, 2002-Ohio-5327, ¶ 65. Also, the fact that Robinson neither met Peterson nor read the case file has no bearing on her ability to testify regarding the dynamics of abuse. Pursuant to our discussion inDyson, supra, and our review of Robinson's experience and training, as set forth in the record, we find this argument to be without merit.
 {¶ 28} Thomas also argues that Robinson's testimony was not based upon reliable scientific, technical or other specialized information. Based upon our review of Robinson's qualifications and her work history, we find that the trial court did not abuse its discretion in determining that her testimony was based upon specialized information.
 {¶ 29} We next turn to the claim that Robinson's testimony was more prejudicial than probative. We conclude that Robinson's testimony was relevant to show the dynamics of abusive relationships, and to explain why a victim might recant her accusation, or be uncooperative with the authorities. We have held that testimony regarding the behavioral characteristics of victims of abuse is permissible. Dyson, supra at 2.
 {¶ 30} Thomas argues that Robinson's testimony was more prejudicial than probative, to the extent that Robinson cited certain statistics concerning domestic violence. Robinson testified that "four women die every day . . . by the hands of a spouse or a mate," that "just in the City of Dayton, alone . . . there's anywhere between . . . thirty-two hundred and thirty-five hundred cases" each year, and that "nationwide . . . six million women are battered every year," at least "the ones that we know about." (T. 390).
 {¶ 31} A person is not guilty of a criminal offense unless: (1) the person's liability is based on his own conduct; and (2) the person had the required degree of culpability for each element of the offense for which one is required by statute. R.C. 2901.22(A). When a defendant acts alone, as happened here, the jury's considerations are limited to the defendant's own alleged acts or omissions.
 {¶ 32} The statistics to which Robinson testified are irrelevant to whether Thomas could be found guilty of Domestic Violence, Burglary, or both. Nevertheless, they have the capacity to persuade a jury to convict him on the view that a conviction is appropriate to address the larger problem of domestic violence. This evidence was, as Thomas argues, more prejudicial than it was probative of his guilt or innocence.
 {¶ 33} Robinson's testimony concerning these statistics was in direct response to the following question the prosecutor posed: "Can you provide us with any information or numbers of incidents that occur with respect to domestic violence a year in the United States?" (T. 390). It seems clear from the question that the witness came prepared to provide the information, and that the prosecutor knew it.
 {¶ 34} The question, like Robinson's response, was objectionable because the statistical facts it sought to elicit are irrelevant to Thomas's guilt or innocence. There was no objection to either, however. Therefore, any error in the court's admission of that evidence is waived. Plain error is not shown.
 {¶ 35} We make these observations out of a concern that our holding in State v. Dyson (October 27, 2000), Champaign App. No. 2000CA2, may be read too broadly as permitting statistical evidence of this kind. In Dyson, we approved the use of expert testimony about the "behavioral characteristics" of victims of domestic violence to explain why they sometimes recant their prior accusations against their abusers. We relied upon State v. Stowers (1998), 81 Ohio St.3d 260, which made the same point about the testimony of victims of violence against children. We approve the use of that evidence here, for the same purpose, because it is proper for impeachment.
 {¶ 36} The State was able to use Robinson's testimony to bolster its impeachment of the victim's trial testimony, and it was able to impeach the victim's testimony without running afoul of Evid.R. 607(A). That rule limits a party's impeachment of its own witness to cases of surprise and affirmative damage. That qualification doesn't apply here, because the victim was called to testify as the court's own witness, not the State's. The State was therefore free to impeach her testimony, and to bolster its impeachment with Robinson's expert opinion evidence relating to the reasons why domestic violence victims sometimes recant their prior truthful statements.
 {¶ 37} The inquiry we approved in Dyson relates to the victim's credibility, or lack of it, when proper for that purpose. The expert's opinion or the basis for it will necessarily involve categorical references. However, the broad and general statistical information the State elicited from its expert in this case is not proper impeachment, and it is objectionable as irrelevant and prejudicial. Dyson does not authorize its use. The State would do well to avoid that line of inquiry in future cases.
 {¶ 38} Finally, although not specifically argued, Thomas implies that Robinson commented on the credibility of Peterson's testimony. Robinson indicated to the jury that she had never met Peterson, nor reviewed her case file, and that she was simply providing information about domestic violence in general. She did not offer an opinion on Peterson's personal credibility, or as to Thomas's guilt or innocence.
 {¶ 39} We conclude that the trial court did not abuse its discretion by designating Robinson as an expert or by permitting her to testify. Therefore, the First Assignment of Error is overruled.
 III {¶ 40} The Second Assignment of Error is as follows:
 {¶ 41} "THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ENTERING A FINDING THAT APPELLANT WAS IN POSSESSION OF AN OPERABLE FIREARM IN COMMITTING AN AGGRAVATED BURGLARY WHICH FINDING IS CONTRARY TO LAW."
 {¶ 42} Thomas contends that the State did not present sufficient evidence to support a conviction for Aggravated Burglary with a firearm specification because there was insufficient evidence to support a finding that he possessed an operable firearm. Specifically, he argues that Peterson was the only witness to the incident, and that her testimony indicated she was "sure it didn't work." He also notes that Peterson indicated that she was not scared because he was "really tryin' to kill hisself [sic]." In fact, at one point Peterson even testified that she did not recall whether Thomas even had a gun.
 {¶ 43} A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law. State v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of State v. Jenks (1991), 61 Ohio St.3d 259:
 {¶ 44} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." Id., at paragraph two of the syllabus.
 {¶ 45} A firearm specification is proven when it is established that the " * * *offender had a firearm on or about the offender's person or under the offender's control while committing the offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense * * *." R.C. 2941.145(A). "Firearm" is defined as " * * * any deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. R.C. 2923.11(B). `Firearm' includes an unloaded firearm, and any firearm which is inoperable but which can readily be rendered operable." Id.
 {¶ 46} To enhance a sentence pursuant to a firearm specification statute, the state must present evidence that a firearm existed and was operable at the time of the offense. State v. Murphy (1990),49 Ohio St.3d 206, syllabus. "However, such proof can be established beyond a reasonable doubt by the testimony of lay witnesses who were in a position to observe the instrument and the circumstances surrounding the crime." Id. This evidentiary standard was broadened by the Ohio Supreme Court's holding that, "in determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." State v. Thompkins, 78 Ohio St.3d 380,1997-Ohio-52, at paragraph one of the syllabus. Therefore, the existence and operability of a firearm may be proved by threats, explicit or implicit, made by the person in control of the firearm.
 {¶ 47} The State presented the testimony of Deputy Kenneth Miller of the Montgomery County Sheriff's Office, who was dispatched to Peterson's apartment on the morning of June 15, 2001. Miller testified that when he arrived, Peterson was "very upset," "crying" and "almost hysterical." He further testified that while she was upset, Peterson informed him that she had been asleep, when she was awakened by Thomas. He testified that Peterson stated that she did not know how Thomas got into her apartment. He testified that Peterson stated that she told Thomas to leave and that when she tried to telephone the police, he pulled the phone from the wall. Peterson also told Miller that Thomas put a pillow over her face and beat her. She stated that she attempted to leave, but that Thomas pulled her back, threw her to the floor, put the pillow back over her face and proceeded to beat her again. Miller testified that Peterson told him that Thomas then removed the pillow, pointed a gun at her face and stated that he was going to kill her. Miller stated that Peterson appeared very upset over the gun. Miller testified that Peterson had injuries to her body, and that the phone had been ripped from the wall.
 {¶ 48} Peterson admitted to calling the police from a phone booth, and to writing a police statement in which she stated that Thomas had pulled the phone from the wall, put a pillow on her face, beat her and pointed a gun at her while stating that if she tried to "leave him he would kill [her]." However, Peterson was emphatic in her claims that she did not want to testify against Thomas, that she had called the police and written the statement because she was mad and wanted to get Thomas into trouble and that the gun did not work.
 {¶ 49} From our review of the record, we find that Deputy Miller's testimony provides sufficient evidence upon which a reasonable jury could find Thomas guilty of a firearm specification, even though this evidence conflicted, in significant part, with Peterson's testimony at trial. It is within the province of the jury to decide issues of credibility of testimony, including the proper weight to assign to conflicting evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Peterson's testimony, even when read on appeal, appears less than credible. Thus, we cannot say that the jury lost its way in crediting the testimony of Deputy Miller, and the excited utterances established by his testimony, over Peterson's trial testimony.
 {¶ 50} While the sufficiency of the evidence offered to prove the operability of the firearm presents a close question, we conclude that the evidence is legally sufficient to sustain the verdict on the specification.
 {¶ 51} The Second Assignment of Error is overruled.
 IV {¶ 52} For his Third Assignment of Error, Thomas states:
 {¶ 53} "THE CONVICTIONS ON THE FOLLOWING OFFENSES MUST BE REVERSED AS THEY ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE: AGGRAVATED BURGLARY AND THE FIREARM SPECIFICATION; DISRUPTING PUBLIC SERVICE."
 {¶ 54} Thomas claims that his convictions for Aggravated Burglary, with a Firearm Specification, and for Disrupting Public Service are not supported by the evidence.
 {¶ 55} In reviewing a judgment to determine whether it is against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v.Thompkins, supra.
 {¶ 56} With regard to the Aggravated Burglary charge, R.C.2911.11(A) states: "No person, by force, stealth, or deception, shall trespass in an occupied structure *** when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1) The offender inflicts, or attempts or threatens to inflict physical harm on another."
 {¶ 57} In this case, the record contains evidence that Thomas was not listed on the lease agreement for Peterson's apartment, and that the only authorized tenants were Peterson and her two children. Furthermore, the record shows that prior to the June 15, 2001 incident, Thomas had been issued notice by the sheriff's department that he was not permitted on the property. The record contains evidence that on that date, Thomas entered Peterson's apartment through a window, without her permission, and Peterson told him to leave. There is also evidence that Thomas beat Peterson, tore the phone cords from the wall, pointed a gun at Peterson and threatened to kill her. We conclude that there is credible evidence in the record upon which a reasonable juror could find that Thomas committed the offense of Aggravated Burglary, with a Firearm Specification.
 {¶ 58} We next turn to Thomas's conviction for Disruption of Public Service. R.C. 2909.04, which governs Disruption of Public Service, provides in relevant part as follows:
 {¶ 59} "(A) No person, purposely by any means or knowingly by damaging or tampering with any property, shall do any of the following:
 {¶ 60} "(1) Interrupt or impair television, radio, telephone, telegraph, or other mass communications service; police, fire, or other public service communications; ***."
 {¶ 61} Thomas contends that the evidence, consisting of Peterson's testimony, demonstrates that the phone he removed from the wall belonged to him, and that he had a right to take it, so that he cannot be found guilty of Disruption of Public Service. We disagree.
 {¶ 62} The statute prohibits purposeful or knowing damaging or tampering with property that interrupts or impairs telephone service. Telephone service includes the initiation of telephone calls. State v.Brown (1994), 97 Ohio App.3d 293, 301. As previously noted, the evidence indicates that after Thomas entered the apartment on June 15, he was told to leave. When he did not leave, Peterson attempted to call the police. At that point, Thomas ripped the phone from the wall. After assaulting Peterson, Thomas left the apartment with the telephone in his possession. At that point, Peterson was forced to contact the police from a pay phone. This is sufficient to sustain the conviction.
 {¶ 63} We have reviewed the record, and we are satisfied that in resolving any conflicts in the evidence, the jury did not lose its way. We conclude that the evidence in the record before us supports the convictions. Accordingly, the Third Assignment of Error is overruled.
 V {¶ 64} The Fourth Assignment of Error is as follows:
 {¶ 65} "APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN TRIAL COUNSEL FAILED TO OBJECT TO AND SEEK A MISTRIAL DUE TO SEVERELY PREJUDICIAL COMMENTS MADE BOTH BY THE PROSECUTOR AND THE TRIAL COURT DURING CLOSING ARGUMENT."
 {¶ 66} In this Assignment of Error, Thomas contends that he was denied the effective assistance of counsel because his attorney failed to object to comments made by the prosecutor and the trial court. Specifically, he claims that counsel should have objected during the State's closing argument when the prosecutor made a reference to rape, and when the trial court stated that closing argument should be disregarded.
 {¶ 67} We evaluate ineffective assistance of counsel arguments in light of the two-prong analysis set forth in Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors created a reasonable probability that, but for the errors, the result of the trial would have been different. Id. at 2064. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id. at 2065.
 {¶ 68} We first address the prosecutor's reference to rape during closing argument. In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v.Jones, 90 Ohio St.3d 403, 420, 2000-Ohio-187, citation omitted. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.' " Id., quoting Smith v. Phillips (1982), 455 U.S. 209,219, 102 S.Ct. 940, 947. We view the state's closing argument in its entirety to determine whether the allegedly improper remarks were prejudicial. State v. Moritz (1980), 63 Ohio St.2d 150, 157, citation omitted.
 {¶ 69} The alleged misconduct complained of by Thomas occurred during the closing argument of the State when the prosecutor stated as follows: "I don't — in rape cases, no means no. A victim can say no in that kind of case. And this isn't a rape case. But Tiffany Peterson still has the right to say no. She's entitled to say no to the Defendant. She spent the summer of 2001 trying to break up with him, but he would not allow her."
 {¶ 70} Thomas contends that this "reference, allusion and analogy to rape, had no basis in fact," and that the "baseless and sensational analogy [only served to] stigmatize and bias a jury contra Thomas."
 {¶ 71} We conclude, from reading the closing argument, that the prosecutor's rape analogy was valid. As noted by the State, both rape and domestic violence involve the exertion of power and control over another person, and "just as no one is obligated to submit to unwanted sexual conduct," no one has an obligation to submit to the unwanted controlling behavior of an abuser. In this case, Peterson attempted to end her relationship with Thomas, which resulted in Thomas assaulting her on three occasions. Furthermore, the case involved trespass by Thomas, which Peterson attempted to prevent by telling him to get out. The prosecutor's analogy aptly made the point that Peterson was permitted to tell Thomas that she did not want to be involved in a relationship and that she did not want him in her home, and that she should not have been subjected to assault because of that. Furthermore, the prosecutor reminded the jury that this case did not involve a rape. Therefore, we cannot say that the prosecutor's statement was improper, that it unfairly prejudiced Thomas, or that counsel was ineffective for failing to object. Indeed, had counsel objected, the matter might have been accentuated in the minds of the jurors, an overruled objection tending to communicate the unspoken message, "ouch, that hurt."
 {¶ 72} The comments made by the trial court of which Thomas complains occurred just before closing arguments. The trial court stated as follows:
 {¶ 73} "The Court would just remind the Jury that what the attorneys say during Closing Argument, both the State and the Defendants, is — is not — you're to — to basically to disregard it. It's not the facts that you're to consider." A review of the transcript reveals that the trial court continued as follows: "The facts that you're to consider in this case are only those facts that have come from this Witness Stand and from the items that have been entered into evidence."
 {¶ 74} While the trial court may have made a poor choice of words by telling the jury to disregard the closing arguments, it is clear that the trial court was merely informing the jury that the arguments do not constitute evidence. Furthermore, the trial court told the jurors to disregard both the prosecution and defense arguments. We find no prejudicial error in this, nor do we find counsel ineffective for having failed to object.
 {¶ 75} The Fourth Assignment of Error is overruled.
 VI {¶ 76} All of Thomas's Assignments of Error having been overruled, the judgment of the trial court is affirmed.
WOLFF and GRADY, JJ., concurs.