[Cite as *State v. Brown*, 2012-Ohio-1848.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

STATE OF OHIO                               :

    Plaintiff-Appellee                  :        C.A. CASE NO.    24541

v.                                          :        T.C. NO.    10CR2005

DAMIEN D. BROWN                             :        (Criminal appeal from
                                                  Common Pleas Court)
    Defendant-Appellant                 :

                                            :

. . . . . . . . . .

**O P I N I O N**

Rendered on the _____27th_____ day of _____April_____, 2012.

. . . . . . . . . .

KIRSTEN A. BRANDT, Atty. Reg. No. 0070162, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

J. ALLEN WILMES, Atty. Reg. No. 0012093, 4428 N. Dixie Drive, Dayton, Ohio 45414
        Attorney for Defendant-Appellant

. . . . . . . . . .

FROELICH, J.

{¶ 1}    Damien Brown was found guilty by a jury of two counts of murder and two counts of felonious assault, each with a firearm specification, and having a weapon while under disability (with a prior offense of violence).  The first four counts were merged, as

were the firearm specifications. Brown was sentenced to fifteen years to life in prison for murder, to three years of actual incarceration on the firearm specification, and to five years for having a weapon under disability, to be served consecutively. Brown appeals from his conviction.

{¶ 2} On June 25, 2010, Marquita Brown ("Marquita") was shot in the head at her apartment. At trial, it was undisputed that Brown was present when Marquita was shot, but the circumstances surrounding the shooting were in dispute.

{¶ 3} The State presented the following evidence at trial:

{¶ 4} At 2:12 a.m. on June 25, 2010, Marquita's five-year-old son called 911 from their home in Dayton and reported that his mother had been shot by Brown. Brown was Marquita's boyfriend and had fled the apartment after the shooting. Marquita was pronounced dead at the scene, and the gun was found next to her body. The body was located in the master bedroom on the second floor of the home. A shoebox of broken picture frames and photographs was spilled at the bottom of the stairs, but there were no other signs of a struggle.

{¶ 5} Forensic evidence established that Marquita had been shot once in the temple from a distance of 2 to 18 inches and that the bullet had traveled in a downward trajectory; forensic evidence also established that five pounds of pressure on the trigger was required to fire the gun when it was cocked. Marquita did not have any other injuries or any defensive wounds. A .22 caliber revolver with one spent cartridge and five live cartridges was found next to the body.

{¶ 6} Brown's mother testified that he had been carrying a handgun the previous

day and that he was planning to go to Marquita's house to eat the night of June 24. Around 2:30 a.m. on June 25, Brown called his mother for a ride.

{¶ 7} Brown's cousin, Terry Jamison, testified that she received a call from Brown's sister around 2:30 a.m. on June 25; the sister was crying and upset. Jamison then spoke with Brown's mother, who arranged for Jamison to pick up Brown near Third Street and Grosvenor. (A detective testified that this intersection was approximately two miles from Marquita's apartment). After picking up Brown, Jamison dropped him off on Cincinnati Street, but she did not see where he went from here. Brown was arrested during the morning of June 25 at an apartment in Harrison Township.

{¶ 8} The State presented testimony from Marquita's sister that she had seen Brown "chok[e]" Marquita in the spring of 2010 at Marquita's apartment. The sister also identified Marquita's and Brown's voices on a voicemail message in which Brown threatened to burn down Marquita's apartment. Two Dayton police officers testified that they had been called to Marquita's apartment approximately two weeks before the shooting on a report of domestic violence, that they saw evidence of destruction at the apartment, that Marquita was upset and reported that Brown had threatened to burn down her apartment.

{¶ 9} Brown testified in his own defense. He stated that he had been "seeing" Marquita for three years and that they had lived together "all the time" with some breaks. He admitted to being present at the shooting, but claimed that the gun had fired accidentally. According to Brown, he initially placed his gun under a mattress in the bedroom, but Marquita retrieved it and pointed it at him when she became upset with him. She cocked the gun, but eventually handed it back to Brown. While Brown was trying to uncock the gun, he

made a comment that upset Marquita, and she attempted to grab the gun from him. Brown claims that the gun fired accidentally during this struggle, and that he fled the scene because he was "shocked and scared."

{¶ 10} Brown was indicted on two counts of murder (deadly weapon and serious physical harm) and two counts of felonious assault (deadly weapon and serious physical harm), each with a firearm specification, and one count of having a weapon under disability. He was tried by a jury. After jury deliberations began, one of the jurors was replaced with an alternate, and deliberations began anew. The jury returned guilty verdicts on all counts. The trial court merged the convictions as described above and sentenced Brown to an aggregate term of twenty-three years to life of imprisonment.

{¶ 11} Brown raises four assignments of error on appeal.

{¶ 12} Brown's first assignment of error states:

COLLECTIVE COMMENTS BY THE PROSECUTOR DURING VOIR DIRE, TESTIMONY, AND CLOSING ARGUMENT REPRESENTED MISCONDUCT AND SERVED TO DENY APPELLANT DUE PROCESS.

{¶ 13} Brown claims that the prosecutor engaged in misconduct by making "snide and improper comments," expressing her personal beliefs to the jury, questioning him in an "inappropriate and harassing" manner, and relying on facts not in evidence during closing argument.

{¶ 14} In reviewing claims of prosecutorial misconduct, the test is whether the remarks were improper and, if so, whether those comments prejudicially affected the substantial rights of the defendant. *State v. Jones,* 90 Ohio St.3d 403, 420, 739 N.E.2d 300

(2000). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *Id.,* quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct.940, 71 L.Ed.2d 78 (1982). Where it is clear beyond a reasonable doubt that the jury would have found the defendant guilty, even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See *State v. Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21. We review allegations of prosecutorial misconduct in the context of the entire trial. *State v. Stevenson,* 2d Dist. Greene No. 2007-CA-51, 2008-Ohio-2900, ¶ 42, citing *Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

{¶ 15} There was no objection to the alleged instances of prosecutorial misconduct; therefore, Brown has waived all but plain error. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 175; *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97; Crim.R. 52(B).

*Voir dire*

{¶ 16} Brown's objection to the prosecutor's conduct during voir dire is reflected in the following passage:

PROSECUTOR: Let's talk about something else. Sympathy. The Defendant gets to stay in the courtroom throughout the entire trial. The victim doesn't get that opportunity. So, you're going to be looking at him

every day. Okay? And you may even form an opinion about how he looks there. I don't know. But the point is, you're going to have to look at him every day.

Anybody here think that any sympathy whatsoever could creep into this trial? And, quite frankly, that's true even for the victim. There is no place for sympathy in this case, whether it's for the victim or the Defendant. Anybody have a problem with that?

{¶ 17} One prospective juror responded to this question. The prospective juror had previously disclosed that she had been abused by her "extremely violent" husband, but had stayed with him for eight years because she thought she "could fix him." Although her response to the prosecutor at this particular point in voir dire was "indiscernible," the prosecutor asked if the juror's response was for the "same reason" that had been discussed earlier. We can glean no additional insight into this interaction from the record, and we note that this prospective juror was not seated. Based on the record before us, we have no basis to conclude that the prosecutor's questions about sympathy for Brown or about "hav[ing] to look at him" during the trial caused any prejudice to Brown.

*Comment on the victim's rights under the law*

{¶ 18} Brown contends that the prosecutor acted improperly by commenting that the victim "gets as much protection under the law as any of you would." (Emphasis in brief.)

{¶ 19} It will be helpful to our discussion to view this comment in context:

PROSECUTOR:   [Prosecutor referred to previously addressed "abusive

relationship and how you feel about * * * a woman in that situation."]  * * *
[I]s there anybody here collectively or individually who have [sic] a problem with the notion that all women are protected equally? All women are protected equally regardless of what you think they might bring on themselves by their own actions.  If a woman chooses to stay with her abuser, for any number of reasons, or, quite frankly, reconcile with them, maybe they were put out but they reconciled, which I'm sure you're familiar with in that cycle of violence. * * * Are you going to hold that against her and say, you know, "You got what you deserved?["]

PROSPECTIVE JURORS:  Huh-uh.

PROSECUTOR:  Okay,  And that's all we're looking for.  She gets as much protection under the law as any of you would.  Can we agree to that? Anybody think they have a problem with that?  * * *

**{¶ 20}**   In our view, the prosecutor did not act improperly in asking the jurors whether they agreed that the victim was protected under the law, even if she returned to an abusive relationship.  The reference to the victim's having as much protection "as any of you" arguably suggested to jurors that they place themselves in the position of the victim. However, such a "golden rule" comment is not per se prejudicial; rather the test is whether it prejudicially affected the substantial rights of the defendant.  *State v. Ross*, 2d Dist. Montgomery No. 22958, 2010-Ohio-843, ¶ 126.  We cannot say that it did.  Moreover, Brown did not object to the question; even if we were to assume, for the sake of argument, that the question were improper, there is certainly no basis to conclude that the question

caused a "manifest miscarriage of justice" requiring reversal of the conviction for plain error. *Underwood*, 2d Dist. Montgomery No. 24186, 2011-Ohio-5418, ¶ 21.

*Manner of questioning the Defendant*

**{¶ 21}** Brown also contends that the prosecutor harassed him during cross-examination by "continuously prefac[ing] her questions with 'You want the jury to believe...'" or a similar preface.

**{¶ 22}** Prosecutors have wide latitude in cross-examining witnesses, subject to the trial court's discretion. *State v. Garfield*, 34 Ohio App.3d 300, 303, 578 N.E.2d 568 (11th Dist.1986).

**{¶ 23}** A trial is an adversarial process, and the trial court did not abuse its discretion in allowing the prosecutor to express some degree of skepticism about Brown's version of events. Defense counsel did not object to the questions. Moreover, our review of the record indicates that the questions about which Brown complains highlighted inconsistencies in his account or were addressed to fairly minor issues, such as how pictures ended up on the floor. We discern no error, plain or otherwise, with respect to this aspect of the prosecutor's cross-examination of Brown.

*Reliance on facts not in evidence during closing*

**{¶ 24}** Finally, Brown contends that the prosecutor argued facts not in evidence during closing argument. In particular, Brown objects to the following statement: "[Brown is] the only person who told you Marquell [Marquita's son] didn't see it. But you know what, Marquell saw enough. Maybe we will never be able to know how much Marquell saw. But he put it together. He put it together. And that's what makes it so reliable."

{¶ 25}  Marquell was not called by either side and did not testify at trial, but his 911 call was played, without objection, for the jury.  In that call, he stated: "Damien Brown has shot my momma."

{¶ 26}  Both prosecutors and defense attorneys are given wide latitude during closing arguments to address what the evidence has shown and what reasonable inferences may be drawn from that evidence. *State v. Black,* 181 Ohio App.3d 821, 2009-Ohio-1629, 911 N.E.2d 309, ¶ 33 (2d Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990).

{¶ 27}  Although no evidence was presented that Marquell witnessed the shooting, the prosecutor urged the jury to take Marquell's perception of what had happened into account.  In other words, the prosecutor urged the jury to make an inference that Marquell knew what had happened in the apartment, without presenting direct evidence that Marquell had seen the shooting. The jury was undoubtedly aware of the uncertainty surrounding Marquell's account, and it was free to draw inferences from his statements to the 911 operator.  Even in Brown's version, he was holding the gun when it fired, albeit accidentally.  Moreover, there is little likelihood that the outcome of the trial would have been different absent the prosecutor's statements, particularly when those statements are considered in the context of all the State's evidence and the prosecutor's entire closing argument.  *State v. Stevens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970).  No plain error occurred during closing argument that undermines our confidence in the jury's verdict.

{¶ 28}  Having found no instances of prosecutorial conduct that amounted to plain error, the first assignment of error is overruled.

{¶ 29}   Brown's second assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN MISAPPLYING OHIO RULE OF EVIDENCE 404 AND ADMITTING TESTIMONY MORE PREJUDICIAL THAN PROBATIVE.

{¶ 30}   Brown contends that the testimony of Margene Robinson, an expert on domestic violence, and other testimony about alleged prior instances of domestic violence should not have been allowed by the trial court because it was "highly prejudicial" and "of little probative value."

{¶ 31}   The decision whether to admit evidence is left to the sound discretion of the trial court, and a reviewing court will not reverse that decision absent an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus. An abuse of discretion implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *State v. Adams*, 62 Ohio St.2d 151, 404 N.E.2d 144 (1980).

{¶ 32}   Evid.R. 404(B) provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."   Relevant evidence is admissible unless its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Evid.R. 402; Evid.R. 403(A).

{¶ 33}   The victim's sister, Kimberly Brown, testified about an incident in the spring of 2010, in which she had seen Brown "chok[e]" Marquita at Marquita's house by

holding his hand to her throat and pushing her against a wall. After Kimberly intervened, Brown called Kimberly and Marquita "project bitches" and threatened to come back with his "chopper." (A detective testified that "chopper" is slang for a gun.) Kimberly also identified Brown's and Marquita's voices on a voicemail message left on Marquita's cell phone on June 13, 2010, in which Brown had threatened to set fire to Marquita's apartment.

{¶ 34} Additionally, two Dayton police officers testified that they had responded to a "threat call" from Marquita's apartment on June 13, 2010, less than two weeks before her death. The officers testified that, on that occasion, the victim was very upset and her clothes were "partially stretched, kind of torn." They also testified that her television was face-down in the kitchen, her stereo had been smashed, framed pictures had been thrown to the floor, and the victim stated that her boyfriend, Brown, had threatened to set the apartment on fire.

{¶ 35} Brown testified that the shooting was an accident. The trial court could have reasonably concluded that the State's evidence of prior incidents of domestic violence and threats made by Brown toward the victim were offered to show his intent, plan, or absence of mistake or accident in killing Marquita, rather than to prejudice the jury against him by proof of prior bad acts. Moreover, the trial court cautioned the jury, both during the trial and in its jury instructions, that this evidence was being received for "a limited purpose" and could not be "consider[ed] * * * to prove the character of the Defendant in order to show that he acted in conformity with that character." The court further instructed that the limited purpose for which the evidence of other acts could be considered was "for the purpose of deciding whether it proves the absence of accident, the Defendants' motive,

opportunity or intent * * *."  Keeping in mind its careful instructions to the jury, the trial court did not abuse its discretion in admitting this evidence.

**{¶ 36}**  Brown also argues that the testimony of Michelle Knight that she had filed a domestic violence charge against Brown years earlier was "a pure attack on his character." Knight's testimony was introduced, along with a copy of a termination entry (Ex. 71) and the testimony of a detective, to establish Brown's 2003 felony conviction on two counts of domestic violence.  Establishing the prior conviction was necessary to support the charge of having a weapon under disability.  Knight did not testify about the nature of the incidents underlying the 2003 offenses, but she did testify about the length of her relationship with Brown, her young age at the time, and the fact that she had pressed charges against him.

**{¶ 37}**  We share Brown's concern about the use of Knight's testimony to establish his prior conviction, when other evidence had been presented to establish that fact.  The State introduced the detective's testimony that Brown had not been allowed to carry a gun at the time of the offense because of his prior felony domestic violence conviction, and the detective identified the judgment entry related to those offenses.  The detective also stated that she had compared the date of birth and social security number of the defendant in the prior case with Brown's and found them to match.  As such, Knight's testimony was not necessary to establish the existence of the prior conviction.  While we do not generally question a party's decision to call two witnesses when one would do, in this situation, there was the danger that the personalization of another complainant could create sympathy in the jury apart from the fact of a prior conviction.  (For example, Knight, who testified that she was a teenager when she dated Brown, was considerably younger than Marquita.)  However,

because Knight's testimony about the prior incidents was very limited, Brown did not object to it, and the court gave the appropriate instruction, we conclude that the trial court's admission of this testimony was not plain error.

{¶ 38} Finally, Brown contends that the testimony of Robinson, a former Dayton police officer who supervised the domestic violence unit, was improper. Brown did not object to Robinson's qualifications, only the relevance and prejudice of her testimony. In response to a State's motion in limine to declare Robinson an expert witness, Brown also argued that the State should not be permitted to "offer Margene Robinson to explain why the victim[']s actions or lack thereof should not be held against [her]" while "restrict[ing] the defense ability to inquire or reference any specific acts of conduct of the victim before the date in question."

{¶ 39} Robinson testified as an expert regarding common misconceptions about domestic violence. Her testimony included various perceived or actual reasons why a victim of domestic violence may not be able to escape her situation. Robinson also testified about the three stages in the cycle of domestic violence. She did not testify about Brown's relationship with the victim, and the State's evidence did not illustrate that the victim's actions or her relationship with Brown fit this pattern.

{¶ 40} Evid.R. 702 states: "A witness may testify as an expert if all of the following apply: (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony; (C) The witness'

testimony is based on reliable scientific, technical, or other specialized information. * * *"

"In determining the admissibility of an expert witness's testimony, a court must consider whether that witness will aid the trier of fact in search of the truth." *State v. Dyson*, 2d Dist. Champaign No. 2000CA2, 2000 WL 1597952 (Oct. 27, 2000). Relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. Evid.R. 403(A); *State v. Thomas*, 2d Dist. Montgomery No. 19435, 2003-Ohio-5746, ¶ 18. The determination concerning the admissibility of expert testimony is a matter committed to the sound discretion of the trial court. *Id.*

{¶ 41} Brown claims that Robinson's testimony was not relevant because her expertise was in domestic violence and, since he was not charged with domestic violence, her testimony confused the issues. The argument frames the issue too narrowly; Brown, after all, was charged with killing someone with whom he had lived "all the time," thus coming within the definition of "person living as a spouse" in the domestic violence statute. R.C. 2919.25.

{¶ 42} However, we are troubled that Robinson's testimony did not directly correspond with any other evidence presented in this case, i.e., no explicit evidence was presented that Marquita felt trapped in her relationship with Brown or that their relationship had fit the cycle of domestic violence. On the other hand, the evidence did establish that Marquita's relationship with Brown was an abusive one, which, coupled with Robinson's testimony, could have helped the jury to understand why Marquita continued to see Brown after the prior incidents, including on the night of the shooting. Thus, it may have weighed

in favor of the State's theory that Brown was still violent despite Marquita's continued relationship with him. In hindsight, this is a close call and it may have been better had that testimony not been admitted. However, we find no reversible error in the trial court's decision to allow Robinson to testify.

{¶ 43} The second assignment of error is overruled.

{¶ 44} Brown's third assignment of error states:

THE TRIAL COURT ABUSED ITS DISCRETION IN EXCUSING A JUROR, LIKELY FAVORABLE TO APPELLANT, IN MEDIAS RES OF DELIBERATION WITHOUT A MANIFEST NECESSITY TO DO SO.

{¶ 45} Brown claims that the trial court's decision to discharge a juror after deliberations had begun was "contrary to law" and denied him his right to a trial by jury.

{¶ 46} A trial judge is empowered to exercise "sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired." *State v. Hopkins*, 27 Ohio App.3d 196, 198, 500 N.E.2d 323 (11th Dist.1985), citing *United States v. Spiegle*, 604 F.2d 961, 967 (5th Cir.,1979); *State v. Sikola,* 5th Dist. Richland No. 06CA72, 2008-Ohio-843, ¶ 39. Put differently, the court has authority to replace jurors with alternates when the jurors "become or are found to be unable or disqualified to perform their duties." Crim.R. 24(F); *see also* R.C. 2945.29. Absent a record showing that the court abused that discretion which resulted in prejudice to the defense, the regularity of the proceedings is presumed. *Beach v. Sweeney*, 167 Ohio St. 477, 150 N.E.2d 42 (1958). *See also State v. Shields*, 15 Ohio App.3d 112, 472 N.E.2d 1110 (8th Dist.1984).

**{¶ 47}** On the afternoon of the third day of trial, the court instructed the jury and the the jury began its deliberations. Later that afternoon, the jury rang the bell asking for the bailiff, and the bailiff found that one of the jurors ("Juror 11") was "crying and upset" and stated that she did not want to continue deliberating. The judge discussed with counsel possible ways of addressing this situation, including asking Juror 11 to "go forward in deliberations" but adding a second question when the jury was polled to assure that each juror's verdict was voluntary, seating an alternate juror and having the jury begin deliberations from the beginning, and asking Juror 11 to reflect overnight on her willingness to continue. They agreed that the judge would talk with the juror in chambers, outside the presence of counsel. (Counsel was excluded based on the judge's concern that the juror might reveal how the jury was leaning in its deliberations.) Defense counsel did not object to this course of action.

**{¶ 48}** The judge talked with Juror 11 in chambers, on the record. The judge then accurately described the conversation to the attorneys as follows:

> I spoke with [Juror 11] and she's very upset. She's very tearful. And she does not want to go back into the jury room to deliberate. And so in light of that I told her what I would do is we would just discharge her as a member of our jury. * * * [S]he's not being very communicative. And part of that I think is because every time she starts to talk, she starts crying. So she's very emotional, very upset. Took her awhile to decide what it was that she wanted to do. In part concerned about not wanting to feel that she was abandoning her obligations or abandoning the folks that she has become friends with as

members of the jury. But fundamentally, she's at the point where she says that she just can't do it. She didn't realize when she became a juror just how she would be impacted by the process and now that the moment of reckoning is here, she just is a mess about it and is emotionally unable to continue.

**{¶ 49}** After the discussion with Juror 11, the judge expressed her intention to discharge Juror 11 "[w]ith counsel's permission" and to replace her with an alternate. Again, defense counsel did not object to this resolution of the issue. Because it was after 5:00, it was snowing, and ice was expected, the trial court indicated that deliberations with the alternate juror would begin the next morning.

**{¶ 50}** One alternate juror remained at the end of the trial. When the jury began its deliberations, the alternate juror was permitted to leave but, as required by Crim.R. 24(G)(1), the court instructed the alternate that he should "not discuss the case nor tell anybody how [he] would have voted" until he was informed that the jury had returned its verdict. The court also asked him to abide by the "code of silence" that is imposed on jurors until he was discharged. The court's discussion with the alternate juror, when he was recalled, is not contained in the record; we presume that he had complied with the court's instructions.

**{¶ 51}** The jury reached a verdict the following day, after more than two hours of deliberations with the newly-seated juror.

**{¶ 52}** R.C. 2945.29 states:

If, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be

designated to take the place of the juror so discharged. * * *

When a juror is replaced by an alternate after deliberations have begun, the trial court "must instruct the jury to begin its deliberations anew." Crim.R. 24(G)(1). The trial court gave this instruction when Juror 11 was replaced with the alternate.

{¶ 53} The trial court fully complied with the legal requirements for replacing a juror after deliberations had begun, and counsel did not object at any point to the court's handling of this issue. Moreover, Brown's assertion that Juror 11 was "likely favorable" to him is wholly speculative, and he has not argued that he was prejudiced in any way by the alternate juror's participation. The trial court acted within its discretion in handling the matter as it did. We find no support for Brown's claims that the court acted "contrary to law" or denied him his right to a trial by jury.

{¶ 54} The third assignment of error is overruled.

{¶ 55} Brown's fourth assignment of error states:

THE TRIAL COURT COMMITTED PREJUDICIAL ERROR BY ENTERING A VERDICT HEREIN WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 56} Brown claims that his conviction was against the manifest weight of the evidence.

{¶ 57} "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is contrary to the manifest

weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *State v. Elmore*, 111 Ohio St.3d 515, 2006-Ohio-6207, 857 N.E.2d 547, ¶ 44.

{¶ 58} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.*

{¶ 59} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 60} The State presented evidence that Brown's gun was fired downward into the victim's temple at close range, that five pounds of pressure was required to pull the trigger of this gun, that Brown had previously abused and threatened the victim, and that he fled the scene rather than seeking help for the victim. Brown testified that the victim had been shot accidentally as she tried to grab the gun from him. The jury's decision to credit the State's evidence did not create a manifest injustice and was not against the manifest weight of the

evidence.

**{¶ 61}** The fourth assignment of error is overruled.

**{¶ 62}** The judgment of the trial court will be affirmed.

. . . . . . . . . .

FAIN, J., concurs.

GRADY, P.J., dissenting:

**{¶ 63}** Defendant claimed that Marquita Brown's death was an accident, the result of their struggle over a gun. The State's theory was that Defendant had instead purposely caused Marquita Brown's death by shooting her with a gun he held. In support of that theory, the State offered extrinsic evidence of Defendant's prior acts of violence committed against or directed toward Marquita Brown. The State also offered evidence of a threat Defendant made involving use of a gun. The State also offered "profile" evidence of domestic violence offenders and their victims.

**{¶ 64}** "Extrinsic act evidence may be admissible to negate a mistake or accident, and, obviously, this theory is closely linked with a demonstration of intent." Weissenberger, Ohio Evidence Treatise, (2010 Ed.), Section 404.25. For that purpose, when a defendant claims or the evidence suggests that a result of his conduct was an accident, extrinsic act evidence may be introduced to show that the defendant's conduct was not accidental but purposeful. Evid.R. 404(B). If the extrinsic act evidence is instead offered to prove that the defendant engaged in conduct of a different kind, the extrinsic act evidence is offered to prove a propensity to engage in such other conduct, which is inadmissible pursuant to Evid.R. 404(A).

{¶ 65}   Defendant's threat at some time in the past to come back to Marquita Brown's house with his "chopper" implies an intent to do her harm with a gun, and was admissible to prove that he purposely shot Marquita Brown.   The evidence of Defendant's other, prior "bad acts" was irrelevant to prove that he acted purposely to shoot Marquita Brown, except on the basis of the prohibited inference of conforming conduct.   The trial court erred in admitting that evidence.   That evidence was also inadmissible to prove why Marquita Brown continued to give Defendant access to her home, because that issue was irrelevant to Defendant's guilt or innocence for the conduct in which he allegedly engaged.

{¶ 66}   Even more disturbing is the testimony of Margene Robinson concerning the "profile" of domestic violence offenders and their victims.   We rejected such evidence as prohibited "propensity" evidence in *State v. Smith*, 84 Ohio App.3d 647, 617 N.E.2d 1160 (1992).   The purpose of the profile evidence was to demonstrate Defendant's propensity to engage in violent behavior, supporting an inference that he acted purposely to shoot Marquita Brown.   The trial court erred when it allowed the State to introduce the testimony of Robinson.

{¶ 67}   The State no doubt had a difficult case to prove.   The shot that killed Marquita Brown was fired in a closed room, and there were no eyewitnesses.   Nevertheless, the State may not seek to   prove Defendant's guilt through character evidence, absent Defendant's prior introduction of character evidence on his own behalf.   Evid.R. 404(A)(1). Justice is not advanced by bending the rules to afford the prosecution a better chance to obtain a conviction.

. . . . . . . . . .

Copies mailed to:

Kirsten A. Brandt
J. Allen Wilmes
Hon. Mary L. Wiseman